# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PAUL SALADINO, MD, | Case No. 7:20-cv-09346-NSR |
| *Plaintiff,* | |
| v. | AFFIDAVIT OF DAVID D LIN, ESQ. IN SUPPORT OF ORDER TO SHOW CAUSE FOR DEFAULT JUDGMENT |
| FRANK TUFANO and FRANKIE'S FREE-RANGE MEAT, LLC, | |
| *Defendants.* | |

STATE OF NEW YORK   )
                    )  ss.
COUNTY OF NEW YORK  )

I, David D. Lin, being duly sworn, deposes and says:

:

1. I am an attorney duly admitted to practice before this Court and the courts of the State of New York, and am a member of LEWIS & LIN, LLC, attorneys for Plaintiff Paul Saladino, MD ("Dr. Saladino" or "Plaintiff"). I am familiar with all the facts and circumstances set forth in this Affidavit. I submit this Affidavit in support of Plaintiff's Order to Show Cause for default judgment against Defendant Frank Tufano ("Defendant Tufano") and Defendant Frankie's Free-Range Meat, LLC (together as the "Defendants").

## **Factual Background**

2. The following factual background is taken largely from Plaintiff's First Amended Complaint in this action ("FAC," Dkt. 11), filed on February 16, 2021, and attached hereto as **Exhibit 1**. It has been updated as necessary since filing.

3.  Dr. Saladino is a licensed physician and a certified functional medicine practitioner through the Institute for Functional Medicine. FAC ¶ 13.

4.  Dr. Saladino offers fee-based private consultation services to consumers regarding use of a carnivore diet to treat medical conditions. He has used this diet to reverse autoimmunity, chronic inflammation, and mental health issues in hundreds of patients. FAC ¶ 15.

5.  Dr. Saladino is the best-selling author of *The Carnivore Code: Unlocking the Secrets to Optimal Health by Returning to our Ancestral Diet*, published by Houghton Mifflin Harcourt. The book is currently a top-ten best-seller on Amazon.com in the category of men's health books. FAC ¶ 16.

6.  Dr. Saladino maintains a social media presence on the internet, including on YouTube, Twitter, and through numerous collaborative podcasts including The Minimalists, Bulletproof Radio, The Dr. Gundry Podcast, The Ben Greenfield Podcast, Dr. Mercola, Health Theory, Mark Bell's Power Project, the Joe Rogan Experience, and many others. FAC ¶ 17.

7.  Dr. Saladino is the owner of all common law rights to the PAUL SALADINO trademark (the "PAUL SALADINO Mark"), and has used his first and last name in commerce and on the internet and social media since as early as June 2017. FAC ¶ 18.

8.  Dr. Saladino created and registered <PaulSaladinoMD.com> in October 2017 and shortly thereafter pointed the domain to a website that promotes his business and services. FAC ¶ 19.

9.  Dr. Saladino operates a San Diego-based business under the PAUL SALADINO Mark which involves his specialty and promotes the use of a carnivore diet to treat heath

issues and lead better lives (the "Business"). The Business caters to four (4) varieties of customers: (1) YouTube viewers which generate advertising revenue through the YouTube platform; (2) third- party social media podcasters who desire Dr. Saladino's audio, video, and real-time interactive content; (3) purchasers of Dr. Saladino's merchandise, including a line of nutritional supplements; and (4) patients who desire private consultation for the treatment of health issues. FAC ¶ 20.

10. Dr. Saladino has used the PAUL SALADINO Mark continuously and extensively in connection with the marketing of the Business. As a result, Dr. Saladino has established a reputation and goodwill in his personal name separately as a trademark. The PAUL SALADINO Mark is unique, distinctive, and has acquired distinctiveness through its association with Dr. Saladino's Business as advertised and sold throughout the United States. FAC ¶ 21.

11. For example, as a result of Dr. Saladino's efforts, and his association with the PAUL SALADINO Mark, his YouTube channel has over 248,000 subscribers, his Twitter account has over 85,000 followers, and his book, *The Carnivore Code,* has recently released a second edition. FAC ¶ 22.

12. Defendant Tufano also maintains a presence on social media, and publishes videos and written statements, including on YouTube and Twitter, to promote his own fee-based medical nutritional therapy services regarding use of a carnivore diet to treat medical conditions. FAC ¶ 23.

13. Defendant Tufano is the founder and owner of Defendant Frankie's Free-Range Meat, LLC, a food delivery business based out of New York City. FAC ¶ 24.

14. Defendant Tufano promotes Defendant Frankie's Free-Range Meat, LLC on, *inter alia*, his YouTube Channel. FAC ¶ 25.

15. Dr. Saladino and Defendants are competitors: they compete for consumers and viewers in the same industry. FAC ¶ 27.

16. Defendants saw the growth of Dr, Saladino's presence on social media, and the spread of Dr. Saladino's good reputation, as a threat to his own enterprise, which is similar in vision to that of Dr. Saladino's. FAC ¶ 28.

17. Defendants undertook a malicious campaign to spread false information and attack Dr. Saladino's good character and reputation for the purpose of hurting Dr. Saladino's business, and to benefit their own competing business. FAC ¶ 29.

18. The coordinated and persistent advertising campaign includes a half a dozen videos directly attacking Dr. Saladino and making numerous false representations of fact. FAC ¶ 30.

19. On October 23, 2020, Defendants created and registered the domain name <PaulSaladino.com> and immediately began pointing it to a defamatory website containing, inter alia, sexually graphic and homophobic images of Dr. Saladino, as well as links to the defamatory videos created and published by Defendants on Defendant Tufano's YouTube Channel, which Defendants use to promote his own competing business interest. FAC ¶ 31.

20. Defendants used their social media presence to attack Dr. Saladino and to distribute the false, defamatory, and misleading statements he has made about Dr. Saladino, including by using Defendant Tufano's YouTube Channel. FAC ¶ 32.

4

21. On November 7, 2019, Defendants published a 15-minute video on Defendant Tufano's YouTube Channel titled "Copy Pasta Salad" which features Defendant Tufano speaking directly to the camera and talking almost exclusively about Dr. Saladino throughout the video (the "First Nov. 7, 2019 Video"). FAC ¶ 33.

22. The First Nov. 7, 2019 Video includes a pinned top message which states: "franktufano@gmail.com for fitness/diet consulting." The First Nov. 7, 2019 Video has over 27,000 views.  FAC ¶ 34.

23. Within the First Nov. 7, 2019 Video, Defendant Tufano describes himself as the  source of all of Dr. Saladino's carnivore diet information, and describes Dr. Saladino as a liar and drug user who is unqualified to provide dietary advice. FAC ¶ 35.

24. Specifically, Defendant Tufano made the following statements in the First Nov. 7, 2019 Video, each of which is false:

    a.    Dr. Saladino "[has] to copy me word for word;"

    b.    Dr. Saladino "is willing to blatantly lie;"

    c.    "[E]very single thing mentioned" on Dr. Saladino's podcast "was ripped directly from [Defendant Tufano's] videos;"

    d.    "All [Dr. Saladino] cares about is making money and promoting himself;"

    e.    Dr. Saladino's "sole purpose is to steal other people's information;"

    f.    "[N]ot one word that comes out of [Dr. Saladino's] mouth is an original thought;"

    g.    Saladino "plagiarized" material from Tufano;

    h.    "[Y]ou can pay this clown doctor [Dr. Saladino] a thousand dollars for a half- assed explanation of [Defendant Tufano's] videos;" and

         i.      "[S]omeone has to pay for [Dr. Saladino's] Adderall prescription."

FAC ¶ 36.

25. On November 7, 2019, Defendants also published a video on Defendant Tufano's YouTube channel titled "Carnivores don't cover their tracks," which features Defendant Tufano speaking directly to the camera about Dr. Saladino (the "Second Nov. 7, 2019 Video"). At the time the First Amended complaint was filed, the Second Nov. 7, 2019 Video had over 12,000 views. FAC ¶ 37. According to a notice from YouTube, the Second Nov. 7, 2019 Video was removed from Defendants' YouTube channel after a copyright claim from another user.

26. Within the Second Nov. 7, 2019 Video, Defendant Tufano asserts that Dr. Saladino pays people to downvote Defendant Tufano's videos on social media, and that Dr. Saladino is a long-time drug user.  FAC ¶ 38.

27. Specifically, Defendant Tufano made the following statements, each of which is false:

         a.      "[Dr. Saladino] has failed to build a supportive audience to such an extent that he still needs to pay people to dislike my videos;" and

         b.      "I think [Dr. Saladino's] brain is literally destroyed from all the amphetamines he's been using over the past 20 years."  FAC ¶ 39.

28. Also, within the Second Nov. 7, 2019 Video, Defendant Tufano admits that he has been "banned from all of the carnivore communities on Facebook and Reddit" but then further admits to creating a new account on Reddit and posting messages regarding Dr. Saladino on the two most popular carnivore forums on that social media site. FAC ¶ 40.

29. The Reddit messages were titled "Popular Carnivore Questions answered by Paul Saladino, MD" and "Great Q & A with Paul Saladino!" and included time stamps of content from actual Dr. Saladino videos such that the included hyperlinks appeared to link to Dr. Saladino's videos, but the disguised hyperlinks actually linked to Defendant Tufano's First Nov. 7, 2019 Video on his YouTube channel. The messages have since been removed by reddit. FAC ¶ 41.

30. On February 5, 2020, Defendants published a video on Defendant Tufano's YouTube Channel entitled "CarnivoreMD Paul Saladino's Plagiarism," which has over 15,000 views, and which contains many of the same defamatory statements and false misrepresentations as the above videos. FAC ¶ 42.

31. On October 16, 2020, Defendants published a video on Defendant Tufano's YouTube Channel entitled "Carnivore MD Paul Saladino COPIED his way to the JOE ROGAN Experience," which features Defendant Tufano again speaking directly to the camera and includes numerous statements about Saladino (the "October 16, 2020 Video"). The October 16, 2020 Video has over 29,000 views. FAC ¶ 43.

32. The October 16, 2020 video contains multiple general and specific misrepresentations of fact about Dr. Saladino and his services, including that Dr. Saladino "plagiarized" Defendant Tufano; that Dr. Saladino "plagiarized throughout medical school"; that Dr. Saladino "used [Defendant Tufano's] information" on the Ben Greenfield Podcast; and that Dr. Saladino has "hundreds of social media workers" monitoring comments. FAC ¶ 44.

33. Defendants' campaign attacking Dr. Saladino has included at least four more such defamatory videos, including videos on: October 17, 2020 entitled "Joe Rogan Paul

7

Saladino Plagiarism Livestream Analysis" which has over 12,000 views; October 18, 2020 entitled "Paul Saladino SUED ME and LOST! STILL OUT $13,000!" which has over 17,000 views; and on October 31, 2020 entitled "PLAGIARIZED OVER 50 TIMES! On the Joe Rogan Podcast by Paul Saladino" which has over 19,000 views. (All of the defamatory videos described herein as the "Defamatory Videos.")  FAC ¶ 45.

34. On November 19, 2020, Defendants' YouTube channel published a video entitled "Paul Saladino SUING ME AGAIN! $500,000!" regarding this proceeding, which has over 17,000 views ("Nov. 19, 2020 Video"). Defendant Tufano spoke directly to the camera and read aloud portions of Plaintiff's First Amended Complaint. As he read, he interjected further generalized defamatory statements similar to the previous videos that Dr. Saladino plagiarized the content of his speaking engagements and book from Defendant Tufano.

35. Specifically, Defendant Tufano makes the following statements, each of which is false:

   a. Dr. Saladino sells "pus-filled testicles" and "eggshell supplements" in his meat supply business;

   b. Dr. Saladino released a second edition of his book for the purpose of changing the cover and the content to better reflect Defendant Tufano's ideas;

   c. That, similar to Defendant Tufano, Dr. Saladino is not licensed to provide medical or nutritional therapy, stating, "Aren't you a psychiatrist? 'Not licensed to provide medical or nutritional therapy,' you aren't either, buddy!" referring to Dr. Saladino; and

      d.  Dr. Saladino has, "copied every single business idea I've had" and that "every single word that comes out of your mouth that's remotely intelligent pertaining to nutrition, came out of my mouth three months prior."

36. Defendant Tufano concludes the Nov. 19, 2020 Video by encouraging his viewers to call Plaintiff's attorney, undersigned counsel David Lin, by reading aloud his number and asking his 100,000 followers to call and, "let them know what you think of them having Dr. Saladino as their client and representing him."

37.    On October 23, 2020, the domain name <PaulSaladino.com> (the "Domain Name") was registered by Defendants, taking their malicious campaign against Dr. Saladino to a whole new level. FAC ¶¶ 46-47.

38. Within days of being registered, the Domain Name began directing to a defamatory website that contains, *inter alia*, sexually graphic and homophobic images of Dr. Saladino, as well as links to Defendant Tufano's YouTube Channel, which Defendants use to promote their own competing businesses, and links to nearly all of the Defamatory Videos (the "Defamatory Website"). FAC ¶ 48.

39. Additionally, featured prominently front and center on the Defamatory Website is the following text:

    Paul Saladino, MD, is apparently "the leading authority on the Carnivore Diet." But what does that make Frank Tufano if Paul has learned everything from Frank's YouTube channel?

    FAC ¶ 49.

## Procedural History

40. This action was commenced by the filling of a Summons and Complaint on November 7, 2020 (Dkt. 1).

41. Defendant Tufano was personally served with the Summons and Complaint by being served himself, with a proof of such service being filed on November 20, 2020 (Dkt. 6), a true and correct copy of which is attached hereto as **Exhibit 2**.

42. A First Amended Complaint ("FAC") was filed on February 16, 2021 (Dkt. 11), which added Defendant Frankie's Free-Range Meat, LLC to the action.

43. Defendant Frankie's Free-Range Meat, LLC was served with the FAC on March 9, 2021 by service on the New York Secretary of State's Office, Ms. Sou Zouky, Legal Clerk. Proof of service was filed on March 16, 2021 (Dkt. 21), a true and correct copy of which is attached hereto as **Exhibit 3**.

44. Defendant Tufano was served with the FAC on February 16, 2021, by service on his attorney Jeffrey Davis via the Court's electronic filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E).  A true and correct copy of the Notice of Electronic Filing is attached hereto as **Exhibit 4**.

45. In addition, Defendant Tufano was also personally served with the FAC on March 5, 2021 by affixing and mailing pursuant to Fed. R. C. P. 4(e)(1) and NY CPLR 308(4). Proof of service was filed on March 10, 2021 (Dkt. 20), a true and correct copy of which is attached hereto as **Exhibit 5**.

46. The docket entries indicate that neither Defendant Tufano nor Defendant Frankie's Free-Range Meat, LLC has filed an answer or otherwise moved with respect to the Amended Complaint herein.

47. On April 1, 2021, the Clerk of the Court issued a Clerk's Certificate of Default which noted the default of Defendant Frankie's Free-Range Meat, LLC (Dkt. 24), a true and correct copy of which is attached hereto as **Exhibit 6**.

48. On April 7, 2021, the Clerk of the Court issued a Clerk's Certificate of Default which noted the default of Defendant Tufano (Dkt. 27), a true and correct copy of which is attached hereto as **Exhibit 7**.

49. On June 18, 2021, Defendants, through their counsel Jeffrey Davis, attempted to file a "Motion to Vacate Default." (Dkt. 28).  However, in a Memo Endorsement (Dkt. 29) the motion was denied for failure to abide by the Court's Rules of Practice.  Instead, the Court granted Defendants leave to serve their motion, and file all motion documents "on or before August 24, 2021.". A true and correct copy of the referenced Memo Endorsement is attached hereto as **Exhibit 8**.

50. On February 10, 2022, almost five months after the extended deadline, Defendants filed their motion to vacate the April 1, 2021 and April 7, 2021 defaults entered and grant Defendants additional time to answer the amended complaint (Dkt. 33). This included an affidavit from Defendant Frank Tufano (Dkt. 34), and a Memorandum of Law in Support of Defendants' Motion to Vacate Default (Dkt. 35). **Exhibit 9.**

51. On July 12, 2022, the Court issued an Opinion & Order denying Defendants' motion to vacate (Dkt. 45) (the "July 12 Order"). In its order, the Court found that service on Defendants was proper, and that they failed to allege meritorious defenses.

52. In that July 12 Order, the Court directed Plaintiff to file a non-emergent proposed order to show cause, and Plaintiff does so now.

11

**This Court has Jurisdiction to Enter Default Judgment against Defendants**

53. This Court has original subject matter jurisdiction pursuant to 28 U.S. Code § 1332 (a) (1). FAC ¶ 9.

54. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331, since Plaintiff brings claims under 15 U.S.C. § 1125, and pendent jurisdiction over the related state law claims asserted pursuant to 28 U.S.C. § 1367 because they involve the same parties, they arise from the same operative facts common to the causes of action arising under the federal claims, and because the exercise of pendent jurisdiction serves the interests of judicial economy, convenience and fairness to the parties. FAC ¶ 10.

55. This Court has personal jurisdiction over both Defendants because both Defendants reside and transact business in New York. FAC ¶ 11.

56. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) (1). FAC ¶ 12.

**Legal Standard for Default Judgment**

57. A litigant has defaulted when she "has failed to plead or otherwise defend" against a claim "for affirmative relief." Fed. R. Civ. P. 55(a). Pursuant to Fed. R. Civ. P. 12(a)(1)(A), a defendant must serve an answer within 21 days after being served with the summons and complaint. If the defendant fails to plead or otherwise defend, the clerk must enter a default against that party. Fed. R. Civ. P. 55(a). Once the clerk has issued a certificate of default, the moving party may apply for entry of default judgment pursuant to Fed. R. Civ. P. 55(b)(2).

58. "[A] default is an admission of all well-pleaded allegations against the defaulting party." *Vt. Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 246 (2d Cir. 2004). "As a general matter, then, a court is required to accept all of the ... factual allegations

[of the nondefaulting party] as true and draw all reasonable inferences in its favor." *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12069 (JPO), 2020 WL 774237, at *1 (S.D.N.Y. Feb. 18, 2020) citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (internal quotation omitted). "Nonetheless, a district court must still determine whether the well-pleaded facts establish liability as a matter of law." *Id*.

59. That, however, is not the end of the inquiry. In determining whether to enter a default judgment, courts in the Second Circuit consider the following factors: "1) whether the defendant's default was willful; 2) whether defendant has a meritorious defense to plaintiff's claims; and 3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Reliance Communications LLC v. Retail Store Ventures, Inc*., No. 12 Civ.2067, 2013 WL 4039378, at *2 (E.D.N.Y. Aug. 7, 2013) (citing *Mason Tenders Dist. Council v. Duce Constr. Corp*., No. 02 Civ. 9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003)).

**The Undisputed Facts Prove All Necessary Elements of Plaintiff's Claims.**

60. The combination of the unchallenged allegations of the Complaint and Plaintiffs' submissions in support of this motion warrant a finding of liability against Defendant on all five of its asserted causes of action.

***(1) Violation of 15 U.S.C. § 1125(a) – False and Misleading Representations of Services.***

61. 15 U.S.C. § 1125(a) provides that " (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(B) in commercial advertising or promotion, misrepresents the nature, characteristics,

qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir. 2001) citing 15 U.S.C. § 1125(a)(1).

62. "Section 43(a) of the Lanham Act proscribes false designations of origin or false or misleading descriptions of fact in connection with any goods in commerce that are likely to cause confusion or that misrepresent the nature, characteristics, qualities, or geographic origin of the goods." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1051 (2d Cir.1995).

63. "To establish a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must prove five elements: 1) the defendant has made a false or misleading statement; 2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) there is a likelihood of injury to [the] plaintiff, such as declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce." *Coty Inc. v. Excell Brands, LLC,* 277 F. Supp. 3d 425, 461 (S.D.N.Y. 2017) (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 348 F. Supp. 2d 165, 177–78 (S.D.N.Y. 2004)). "An advertisement is literally false when the message [is] unambiguous, and in such cases consumer deception is presumed." *Travel Leaders Grp., LLC v. Corley*, No. 19CV1595GBDJLC, 2019 WL 6647319, at *7 (S.D.N.Y. Dec. 5, 2019) citing *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 450 (S.D.N.Y. 2012).

14

64. The first element is met because Defendants have made substantial amounts of false and misleading statements about Dr. Saladino. Defendants have published multiple YouTube Videos in which Defendant Tufano falsely accused Dr. Saladino of stealing carnivore diet information from himself and described Dr. Saladino as a dishonest thief and drug user who is unqualified to provide dietary advice. FAC ¶¶ 35-39; 42-45. Defendants further continued his defamatory campaign on Reddit. FAC ¶¶ 40-41. Defendants even registered <PaulSaladino.com> and used this Domain Name to host a Defamatory Website. On this Defamatory Website, Defendants continuing falsely accused Dr. Saladino of plagiarism, posting sexually graphic and homophobic images of Dr. Saladino, and sharing links to Defendants' YouTube Channel. FAC ¶¶ 46-49. Defendant's such statements and representations are literally false.

65. The second element is met because "[w]hen an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public." *See Time Warner Cable, Inc. v. DIRECTV*, 497 F.3d 144, 153 (2d Cir. 2007) (internal quotations omitted).

66. Third, Defendants' false representation is material in that it is likely to influence purchasing decisions. Dr. Saladino is a licensed physician, a writer, a social media influencer, and operates business to promote the use of a carnivore diet to treat health issues and lead better lives. FAC ¶¶ 13-20. Defendants' false representations include accusing Dr. Saladino of being a liar, accusing him of plagiarizing (both Defendants' content and while in medical school), and accusing him of being a life-long drug user; Defendants even posted sexually graphic and homophobic images of Dr. Saladino

online that present Plaintiff in a negative and false light. Defendants' such representations significantly undermine Dr. Saladino's professional and personal image. Those representations are so material that it will likely influence Dr. Saladino's potential clients' and audience's judgments on Dr. Saladino's professional capabilities, personal integrity, and general reputations, given that clients of a health consultancy physician do not want to engage the services of a doctor who is a drug addict or who cheated in medical school. Hence Defendants' representations will affect those audience and clients' decisions in subscribing and doing business with Dr. Saladino.

67. Fourth, there is a likelihood of injury to Dr. Saladino, such as declining sales or loss of goodwill because Defendants could mislead the customers to believe Dr. Saladino was indeed committed plagiarism, a drug user, and hence incapable of providing services regarding carnivore diet.  Moreover, because Defendants make false claims of Plaintiff plagiarizing Defendants' own content, such "a false comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer," and therefore "no proof of likely injury is necessary."  *Coty*, 277 F. Supp. 3d at 463 (citing *Time* Warner, 497 F.3d at 162).

68. Finally, because Dr. Saladino published audio, video, and real-time interactive content on the internet, Dr. Saladino's goods travel in interstate commerce. *See United States v. Yücel*, 97 F. Supp. 3d 413, 419 (S.D.N.Y. 2015) ("The internet is an instrumentality of interstate commerce.")

69. Therefore, Dr. Saladino has sufficiently pled a violation of 15 U.S.C. § 1125(a) – False and Misleading Representations of Services.

*(2)* *Violation of 15 U.S.C. § 1125(d) – Cyberpiracy.*

70. The Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A) ("ACPA") imposes liability on any person who "registers, traffics in, or uses a domain name that ... is identical or confusingly similar to" a trademark. *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12069 (JPO), 2020 WL 774237, at *3 (S.D.N.Y. Feb. 18, 2020) citing 15 U.S.C. § 1125(d)(1)(A). A plaintiff bringing a claim under § 1125(d)(1)(A) must demonstrate that (1) its trademark is either distinctive or famous, (2) the domain name is identical or confusingly similar to the trademark, and (3) the defendant acted with a bad-faith intent to profit from the trademark. *See Sporty's Farm L.L.C. v. Sportsman's Market, Inc*., 202 F.3d 489, 497–99 (2d Cir. 2000).

71. First, Dr. Saladino's mark PAUL SALADINO is distinctive or famous. "An unregistered mark is entitled to protection under the Lanham Act if it would qualify for registration as a trademark." *Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 381 (2d Cir. 2005) Moreover, "[s]econdary meaning can attach to a descriptive mark where the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 670 (S.D.N.Y. 2018) *citing Time, Inc. v. Petersen Pub. Co. L.L.C*., 173 F.3d 113, 117 (2d Cir. 1999)

72. Here, Dr. Paul Saladino has used the PAUL SALADINO Mark continuously and extensively in connection with the marketing of the Business. As a result, Dr. Saladino has established a reputation and goodwill in his personal name separately as a trademark. The PAUL SALADINO Mark is unique, distinctive, and has acquired distinctiveness through its association with Dr. Saladino's Business as advertised and

sold throughout the United States. As a result of Dr. Saladino's efforts, and his association with the PAUL SALADINO Mark, his YouTube channel has over 67,000 subscribers, his Twitter account has over 40,000 followers, and his book, The Carnivore Code, has recently released a second edition.  FAC ¶¶ 21-22.

73. Second, the Domain Name <PaulSaladino.com> is "identical or confusingly similar to" the Dr. Saladino's mark PAUL SALADINO. 15 U.S.C. § 1125(d)(1)(A)(ii)(I). *See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) (finding domain name <sportys.com> is "identical or confusingly similar to" the *sporty's* mark), citing *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir.1999) (observing that the differences between the mark "MovieBuff" and the domain name "moviebuff.com" are "inconsequential in light of the fact that Web addresses are not caps-sensitive and that the '.com' top-level domain signifies the site's commercial nature").

74. The ACPA provides a list of nine bad-faith intent factors, 15 U.S.C. § 1125(d)(1)(B)(i), but courts are "not limited to considering just the listed factors when making our determination of whether the statutory criterion has been met." *Sporty's Farm*, 202 F.3d at 498. As shown above and discussed below, the relevant factors are plainly established by the undisputed allegations stated in the Complaint.  First, Defendants have no trademark or other intellectual property rights to the domain name or the PAUL SALADINO Mark, and Defendants' legal names are not comprised in the domain name.  FAC ¶¶ 56-58; 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(II).  Defendants do not use the domain for the bona fide offering of goods or services, or for bona fide noncommercial use given, that the website the Domain Name resolves to contains false and defamatory,

sexually graphic, and homophobic statements about Defendants' business competitor, and links to Defendant's own YouTube channel which promotes their own competing businesses; such use is clearly intended for Defendants' commercial gain and made with the intent to tarnish or disparage Plaintiff's PAUL SALADINO Mark.  FAC ¶ 46, 48; 15 U.S.C. § 1125(d)(1)(B)(i)(III)-(V).  Thus, there can be no dispute that the Defendants' Domain Name was registered and used in bad faith with knowledge of Plaintiff's prior rights in the PAUL SALADINO trademark.

### (3)  *Violation of NY Gen Bus L § 148 – Unlawful Registration of Domain Name*

75. The New York General Business Law makes it unlawful to "register a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, without that person's or entity's consent, with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party." N.Y. Gen. Bus. Law § 148.

76. On December 18, 2020, Defendant Tufano, through his counsel Jeffrey Davis, admitted to Plaintiff's counsel that Tufano's "initial contention" was that if Plaintiff wanted the Domain Name, then Plaintiff "was going to need to buy it" from Tufano. This representation, coupled with the Defendants' bad faith intent to profit as shown above, provide an inference that Defendants intended to profit from selling the Domain Name to Plaintiff for financial gain.

### (4)  *Violation of NY Gen Bus L § 349 – Unfair and Deceptive Trade Practices*

77. The New York General Business Law makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state...." N.Y. Gen. Bus. Law § 349(a). "To state a claim

19

under GBL § 349, a plaintiff must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) citing *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29, (2000) (internal quotation omitted).

78. Defendants' actions are consumer-oriented because (1) Defendants and Plaintiff compete for consumers in the same industry, *id.* ¶ 27; (2) by using the paulsaladino.com Domain Name, Defendants are diverting potential consumers away from Dr. Saladino and towards Defendants' businesses and Defendant Tufano's YouTube Channel, FAC ¶¶ 56, 63; and (3) by republishing the Defamatory Videos and using of the Domain Name and Defamatory Website, Defendants are deceiving consumers and using false pretense and misrepresentation of material facts concerning Plaintiff's and Defendants' services, *id.* ¶ 69.

79. Defendants' acts are misleading in that they falsely state that Dr. Saladino, a physician whose business is devoted to healthy living, is a liar; cheated through medical school; is not knowledgeable about his work such that he copies Defendants' content; and is a long-time abuser of drugs.  FAC ¶¶ 36, 38, 44.

80. Plaintiff has suffered and continues to suffer damage to his reputation and is forced to deal with significant disruptions caused by Defendants' illegal acts.  Defendants' acts are false, misleading, and misrepresent the nature of Dr. Saladino's services. As a direct and proximate result of Defendants' unlawful, deliberate, and malicious conduct as set forth above, Dr. Saladino has been, and will continue to be, damaged both irreparably and monetarily.  FAC ¶¶ 52-53, 69-70.

#### *(5) Defamation Per Se*

81. Defamation requires a plaintiff to show: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability." *Chau v. Lewis*, 771 F.3d 118, 126–27 (2d Cir. 2014) (citation omitted) (applying New York law).

82. "New York recognizes certain statements as defamatory per se, meaning they are actionable without pleading and proof of special damages." *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (internal citation omitted). "One useful general rule is that a writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." *Id*. (internal citation omitted). In other words, "[w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed." *Id*. (internal citation omitted). *See Yesner v. Spinner*, 765 F.Supp. 48, 52 (E.D.N.Y. 1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se,' and therefore actionable without any proof of special damages."); *Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64, 65, 605 N.Y.S.2d 34 (1st Dep't 1993) (statements that impugn "the basic integrity, creditworthiness and competence of the business" are defamatory per se); *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) ("words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof") (internal quotation omitted).

21

83. There can be no dispute that Plaintiff has alleged and shown that Defendants' actions constitute defamation per se.  Defendants falsely state that Plaintiff "cop[ied them] word for word;" that Dr. Saladino "is willing to blatantly lie;" that "every single thing mentioned" on Dr. Saladino's podcast "was ripped directly from [Defendant Tufano's] videos;" that "All [Dr. Saladino] cares about is making money and promoting himself;" that Dr. Saladino's "sole purpose is to steal other people's information;" that "not one word that comes out of [Dr. Saladino's] mouth is an original thought;" that Saladino "plagiarized" material from Tufano; that "you can pay this clown doctor [Dr. Saladino] a thousand dollars for a half assed explanation of [Defendant Tufano's] videos;" and that Dr. Saladino has an "Adderall prescription."  FAC ¶ 36.  These and several other statements identified in FAC ¶¶ 37-45 are all false and intentionally made, were published to third parties on the internet, and concern Dr. Saladino in his business, trade and profession as a physician who counsels on personal nutrition and health issues.

**This Court Should Enter Default Judgment Against Defendants.**

84. As held in the Court's July 12, 2022 Order, a default judgment is appropriate as Defendants' defaults were willful, there were no meritorious defenses, and there would be substantial prejudice to Plaintiff if a default judgment was not entered.

*Defendants' Default Was Willful*

85. An unexplained failure to answer a complaint is generally sufficient to establish willfulness. *See Elgard Corp. v. Brennan Const. Co*., 248 F.App'x. 220, 222 (2d Cir. 2007); *Indymac Bank v. Nat'l Settlement Agency, Inc*., No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007); *Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11 Civ. 46, 2012 WL 194075, at *3 (E.D.N.Y. Jan. 17, 2012).

86. Where a defendant elects not to answer a complaint, such behavior should be interpreted as willful. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F. 3d [238] 243-44 (2d Cir. 1994) (defendant has been found willful where the defendant failed, for untenable reasons, to answer the complaint). In this instance, Defendants' default is demonstrably willful.

87. To this day, Defendants have still not answered the FAC, despite knowing that they are in default.

88. The Court ruled in its July 12 Order Defendants' default was willful. (.

**Lack of Meritorious Defense**

89. Defendants have no meritorious defense to Plaintiff's claims. *See, e.g., Indymac Bank v. Nat'l Settlement Agency*, Inc., No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007) (plaintiff's allegations deemed admitted where defendant presented no defense); *Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11 Civ. 46, 2012 WL 194075, at *3 (E.D.N.Y. Jan. 17, 2012) (same); *Mack Fin. Servs. V. Poczatek*, No. CV-10-3799, 2011 WL 4628695, at *4 (E.D.N.Y. Aug. 30, 2011) (same); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 153 (D.D.C. 2011) (granting default judgment on trademark infringement and under ACPA where defendants were "totally unresponsive."). Given that the Defendants have presented no defense despite being properly served, it is reasonable to infer that Defendants were aware of the deadline for asserting a defense and elected not to do so. As such, the second factor weighs in favor of granting default judgment to Plaintiff.

90. The Court ruled in its July 12 Order that Defendants have failed to adequately allege any meritorious defenses.

*Prejudice to Plaintiff*

91. Plaintiff would be prejudiced if a default judgment is not granted, "as there are no additional steps available to secure relief in this Court." *Mack Fin. Servs. V. Poczatek*, No. CV- 10-3799, 2011 WL 4628695, at *4 (E.D.N.Y. Aug. 30, 2011) (quoting *Bridge Oil Ltd. v. Emerald Reefer Lines*, LLC, No. 06-CV-14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) (citations omitted). Without the entry of default judgment, Plaintiff will not be able to recover damages for Defendants' tortious acts, nor remedy Defendants' wrongful behavior, which has gone unabated since the filing of this action. Accordingly, the third factor supports entry of a default judgment.

## Relief Sought

## Damages

92. Plaintiff seeks damages as follows: $100,000 for Defendants' false representations in violation of 15 U.S.C. § 1125(a); $100,000 for Defendants' violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); attorneys' fees of $35,000 pursuant to the Lanham Act, costs pursuant to 15 U.S.C. § 1117(a); $657,000 for Defendants' violation N.Y. Gen. Bus. L. § 148; $1,000 for Defendant's violation of N.Y. Gen. Bus. L. § 349; and $1 in nominal damages and $29,600 in punitive damages as these statements constitute defamation per se.

93. Under Rule 55(b)(2) of the Federal Rules of Civil Procedure, "the court may conduct…a hearing" to determine the amount of damages in a default judgment. However, the Second Circuit has clarified it is not necessary for the District Court to hold a hearing, "as long as it ensured that there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping*

*Corp., Div. of Ace Young, Inc.*, 109 F.3d 105, 111 (2d Cir. 1997) (quoting *Fustok v.*

*ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)).

94. Here, Plaintiff has well-pleaded allegations establishing Defendants' liability, and this

Court has denied Defendants' request to vacate the default judgment. Thus, the "sole

issue that remains before the court is whether the plaintiff can show, with 'reasonable

certainty,' entitlement to the amount of damages [he] seeks." *Trinity Biotech, Inc. v.*

*Reidy*, 665 F. Supp. 2d 377, 380 (S.D.N.Y. 2009) (citations omitted). While factual

allegations may be taken as true for the purposes of determining default judgment

liability, plaintiff must prove the amount of damages to which he is entitled. *See*

*Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton*

*Masonry & Const., LLC*, 779 F.3d 182, 187 (2d Cir. 2015); *Credit Lyonnais Sec., Inc.*

*v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) ("Even when a default judgment is

warranted based on a party's failure to defend, the allegations in the complaint with

respect to the amount of the damages are not deemed true.")

95. As an illustration, damages were awarded pursuant to a default judgment were found

to be reasonably certain without an inquest where plaintiff submitted a declaration

regarding final audits with total gross premiums owed by defendants and final bills that

represent the adjusted premium amounts owed. *Hartford Fire Insurance Company v.*

*Queens County Carting, Inc.*, No. 20-CV-01844 (NSR), 2022 WL 1093201, at *2 (Apr.

5, 2022). This represented a "sum certain" amount, and a further inquest was not

necessary. *Id.* (citing *Am. Empire Surplus Lines Ins. Co. v. JJSL Dev., Inc.*, No 14-CV-

5353 (ENV)(PK), 2017 WL 1063439, at *4 n.3 (E.D.N.Y. Mar. 21, 2017). To contrast,

an inquest was deemed necessary to establish damages in a lost wages suit where a

former employee could establish he was not being paid minimum wage, but could not establish the damage amount. *Cid v. J.T. Auto & Body Shop, Inc.*, No. 18-CV-9284 (AJN), 2019 WL 4686531, at *2 (Sep. 26, 2019). The inquest was deemed necessary because the plaintiff's recollections included in his affidavit were contradictory, namely the amount of hours worked in plaintiff's own statement were inconsistent. *Id.*

96. Moreover, even in a case where costs are not calculable, or the damages are not liquidated, it is still not necessary for the court to hold a hearing, "as long as it ensured that there was a basis for the damages specified in a default judgment." *Fustok*, 873 F.2d, at 42 (finding an inquest was not necessary where the District Court relied on detailed affidavits and documentary evidence, supplemented by the judge's personal knowledge of the record garnered over four years).

97. Largely, the nature of damages in this case are statutory, and similar to the holding in *Fustok*, this Court need only find there was a basis for the damages specified here. Based on this detailed affidavit and documentary evidence being submitted to the Court, and the statutory nature of many of the damages sought, there is a reasonable certainty that Plaintiff is entitled to the amount of damages sought, and an inquest is not necessary.

***(1) Violation of 15 U.S.C. § 1125(a) – False and Misleading Representations of Services.***

98. "Under the law of the Second Circuit, even where a plaintiff has not demonstrated injury, the equitable disgorgement of a defendant's profits may be ordered in the interests of deterrence if the plaintiff can show that defendant willfully violated the Lanham Act." *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 342 (S.D.N.Y.), *on reconsideration,* 394 F. Supp. 3d 368 (S.D.N.Y. 2019) (citing

26

*George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)). "Section 35 of the Lanham Act specifically provides that 'if the court shall find that the amount of the recovery based on profits is inadequate . . . the court may in its discretion enter judgment for such sum as the court shall find to be just.'" *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262-63 (2d Cir. 2014) (quoting 15 U.S.C. § 1117(a)). "While this enhancement provision, introduced in 1905, 'was included to enable courts to redress fully plaintiffs whose actual damages were difficult to prove,' we have since reasoned that enhanced damages may also be awarded . . . where 'deterrence of willful infringement is needed.'" *Id.* (citation omitted). In "exceptional cases," as contemplated by 15 U.S.C. § 1117(a), where the defendant acted in bad faith, this District has awarded attorneys' fees. *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1026 (S.D.N.Y. 1994).

99. Through Defendants' counsel Jeffrey Davis, Plaintiff has acquired redacted copies of Defendant Tufano's bank statements. Attached hereto as **Exhibit 10** is a true and correct copy of one such statement received from Mr. Davis. The document indicates that it is a checking account statement for Mr. Tufano for the period December 1-30, 2020. During this time, deposits were made into Mr. Tufano's account in excess of $18,000. Given that Defendant's conduct occurred no later than November 7, 2019, and continues to the present (*i.e*, 33 months), Plaintiff posits that Defendants have received over $300,000 in profit during this time. Plaintiff seeks an award of $100,000 to mitigate the confusion created by Defendants' willful false advertising and deter them and others from similar behavior in the future.

100.    Plaintiff also seeks an award of his reasonable attorneys' fees, which are currently over $35,000.  The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Second Circuit has held that "the prerequisite to a finding that a case is sufficiently 'exceptional' to warrant an award of fees is that the infringement was 'willful' or in 'bad faith.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108-09 (2d Cir. 2012) (*citing Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003)). Here, the Complaint pleads facts demonstrating that Defendants' false statements above Plaintiff and his business practices, drug use and sexual practices were made willfully and in bad faith.  Accordingly, an award of attorneys' fees and costs is appropriate.

101.    All invoices that have been issued to Plaintiff are attached herein as **Exhibit 11**. The sum cost of these invoices is $30,003.25. This amount, plus any future billed expenses in resolving this case, should amount to $35,000, and is the appropriate reward for attorneys' fees.

102.    An inquest is also not necessary in the determination of attorney's fees, as long as there is sufficient documentation supporting the amount of hours claimed. *Fustok*, 873 F.2d at 40 (finding attorney's fees for a portion 42,000 hours of work reasonable and could be awarded without an inquest given the trial and supporting motions submitted to the court). Accordingly, the award of attorneys' fees without an inquest is supported by the documentation provided herein.

***(2)  Violation of 15 U.S.C. § 1125(d) – Cyberpiracy.***

103. For Plaintiff's cybersquatting claim, Dr. Saladino may elect "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

104. "To determine what damages award is just, courts have looked to the following factors, drawn from copyright law:"(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." *Salvatore Ferragamo S.p.A.*, 2020 WL 774237, at *4 citing *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 125 (S.D.N.Y. 2003). Regarding any factual uncertainties, "[t]he Second Circuit instructs that in determining infringement damages, courts are to resolve against [defaulting] defendants any factual uncertainties." *Sara Lee Corp. v. Bags of N.Y., Inc*., 36 F. Supp. 2d 161, 169 (S.D.N.Y. 1999). And the remaining factors cut decisively against Defendants: Dr. Saladino's trademarks are undeniably valuable, and Defendant's conducts were willful.

105. Given the circumstances in this case, the egregiousness of Defendants' cybersquatting, the use of the Domain Name to promote Defendants' competing business and defame Plaintiff, Defendants' refusal to cooperate in this litigation, and Defendant's likely profit of over $300,000 in connection with his willful acts, Plaintiff seeks $100,000 in statutory damages for Defendants' actions in violation of the ACPA.  Plaintiff also seeks his attorneys' fees of no less than $35,000 pursuant to 15 U.S.C. § 1117(a).

### (3) N.Y. Gen. Bus. Law § 148.

106.  In the determination of damages in a case over which a federal court exercises diversity jurisdiction, state substantive law governs. *Negrin v. Kalina*, No. 09 Civ. 6234(LGS)(KNJ), 2013 WL 6671688, at *4 (S.D.N.Y. Dec. 17, 2013), *report and recommendation adopted*, 2014 WL 67231 (S.D.N.Y. Jan. 7, 2014). Accordingly, in determining the amount of damages for violation of N.Y. Gen. Bus. Law § 148, this Court can apply the statutory damages calculation below.

107.  Pursuant to N.Y. Gen. Bus. Law § 149, for a civil violation of N.Y. Gen. Bus. Law. § 148, "[i]n addition to injunctive relief, the court may fine the person or entity that registered a domain name in violation of this article, one thousand dollars for each day the violation occurs. The court may also order the transfer of the domain name as part of the relief awarded." N.Y. Gen. Bus. Law § 149.

108.  Defendants registered the Domain Name on October 23, 2020.  FAC ¶ 3.  To this day (*i.e.*, 657 days after registration of the Domain Name), defendants continue to own the domain name and continue to have it resolve to the defamatory website about Plaintiff, while using the website to promote Defendants' competing businesses.  Accordingly, Plaintiff seeks $657,000 in statutory damages for Defendants' violation of N.Y. Gen. Bus. Law. § 148.

### (4) Violation of N.Y. Gen. Bus. L. § 349 – Unfair and Deceptive Trade Practices

109.  Under N.Y. Gen. Bus. L. § 349(h) a person who has been injured by a violation of the unfair and deceptive trade practices of another may be awarded actual damages up to $1,000 if the defendant willfully or knowingly violated this section. Additionally, § 349(h) also provides for the reward of reasonable attorneys' fees.

110. As discussed, Defendant and Plaintiff compete in the same industry, Defendant registered <PAULSALADINO.COM>, and then proceeded to repost defamatory material he created on Defendant's YouTube channel. This constitutes a willful violation of unfair and deceptive trade practices law.

111. Because of this, damages of $1,000 should be awarded to Plaintiff. The damage to Plaintiff's business and the gain of Defendant, as evidenced by Defendant Tufano's bank records, exceeds the $1,000 cap of N.Y. Gen. Bus. L. § 349.

## (5) Defamation Per Se

112. As referenced in ¶ 82, if a statement is defamatory per se, injury is presumed. *Celle*, 209 F.3d at 179. Given the statements made by Defendant are defamation per se, even if actual damages cannot be shown, a plaintiff may recover nominal damages. *Id.* (internal citations omitted).

113. Plaintiff asks the Court for nominal damages of $1 and punitive damages of $29,600, which is commiserate with the potential income generated by Defendant's defamatory videos.

114. Upon information and belief, Defendants generate income from the advertising revenue generated from YouTube videos through the service Google AdSense. Defendant Tufano confirmed his use of the service in a video posted to his channel on Nov. 24, 2020 entitled "How much do I make from YouTube?"

115. Google AdSense provides compensation to YouTube creators who amass over 10,000 views per month. While the payment per view rate fluctuates depending on multiple factors, the average price per view is $0.20. *See See How Much You Could Earn from*

*AdSense*, Google AdSense, https://www.google.com/adsense/start/#calculator (last accessed Aug. 10, 2022).

116. In total, the published defamatory videos on Defendants' YouTube have garnered approximately 148,000 views. Specifically, at the time of writing, the view counts rounded down to the nearest thousand are:

   a.  The First Nov. 7, 2019 Video with 27,000 views;

   b.  The Second Nov. 7, 2019 Video with 12,000 views;

   c.  The video published February 5, 2020, with 15,000 views;

   d.  The video published October 16, 2020, with 29,000 views;

   e.  The livestream recorded and published October 17, 2020, with 12,000 views;

   f.  The video published October 18, 2020, with 17,000 views;

   g.  The video published October 31, 2020, with 19,000 views; and

   h.  The Nov. 19, 2020 Video with 17,000 views.

117. The 148,000 views, at a rate of $0.20 per view, Defendants have earned approximately $29,600. Profit earned directly through the defamatory content created and published by Defendants.

118. Accordingly, Plaintiff is requesting $1 in nominal damages and $29,600 in punitive damages, which would be an appropriate deterrent to Defendant continuing his defamatory behavior.

**Permanent Injunction**

119. Under the Lanham Act, district courts have the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116. To secure a permanent injunction, in particular, a plaintiff must

demonstrate success on the merits, as well as that "(1) he is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships tips in his favor; and (4) the public interest would not be disserved by the issuance of a [permanent] injunction." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

120.  In this case, Dr. Saladino has already established success on the merits. And irreparable injury is demonstrated because "Defendants' refusal to defend this action creates a threat that they will continue to infringe [Dr. Saladino's] trademarks unless permanently enjoined from doing so." *Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039, 2018 WL 3559085, at *5 (S.D.N.Y. 2018). Further, irreparable injury arises from the threatened damage "to the reputation of [Dr. Saladino's] products, for which it would be difficult to determine monetary damages." *Id*. For that same reason, monetary damages are inadequate "[b]ecause the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable." *NYP Holdings v. N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 342 (S.D.N.Y. 2014) (quoting U.S. *Polo Ass'n, 800 F. Supp. 2d* at 541). The balance of hardships weighs in favor of an injunction, as Dr. Saladino has "spent substantial time and money marketing [his] products and establishing the good will and reputation for quality" associated with them. *Ideavillage*, 2018 WL 3559085, at *5. Finally, the public interest favors an injunction: "the public has an interest in not being deceived — in being assured that the mark it associates with a product is not attached to goods of unknown origin and

quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

121.  Because each of these elements weighs in favor of Dr. Saladino, this Court should grant the request for a permanent injunction.  Plaintiff therefore requests that the Court order (1) that the Domain Name be permanently transferred to Plaintiff; (2) that Defendants be enjoined from making public statements referencing that Plaintiff copied, plagiarized, stole or otherwise improperly used Defendants' or any other third party's work; engages in dishonest practices in connection with his business, trade, or profession; abuses prescription or illegal drugs; improperly or illegally manipulates social media posts; or engages in any inappropriate sexual activity; and (3) that Defendants be required to remove and delete all of the defamatory videos referenced above, including:

    a.  The First Nov. 7, 2019 Video:

        https://www.youtube.com/watch?v=cyXgRJ99gks;

    b.  The video published February 5, 2020:

        https://www.youtube.com/watch?v=TJI8H1_joO8;

    c.  The video published October 16, 2020:

        https://www.youtube.com/watch?v=u4phKzDtfkE;

    d.  The video published October 18, 2020:

        https://www.youtube.com/watch?v=2qTeIKWcCg8;

    e.  The video published October 31, 2020:

        https://www.youtube.com/watch?v=ycGK23AC4J4; and

    f.  The Nov. 19, 2020 Video: https://www.youtube.com/watch?v=s4eEVzzaylM

## **Conclusion**

122.  For the foregoing reasons, Plaintiff respectfully requests that this Court enter default judgment against Defendants Frank Tufano and Frankie's Free-Range Meat, LLC.


I declare under penalty of perjury that the foregoing is true and correct.


_____
DAVID D. LIN



Sworn to before me this

12 day of August, 2022

_____
NOTARY PUBLIC

RICKY D DANIELS
Notary Public - State of New York
NO. 01DA6087722
Qualified in New York County
My Commission Expires 2/24/2023